UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

                              :

O.F.C.,                              :

               Petitioner,      :

                              :             25-cv-9816 (LJL)

       -v-                      :

                              :       OPINION AND ORDER

JUDITH ALMODOVAR, et al.,      :

                              :

              Respondents.    :

                              :

---------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   1/9/2026
```

LEWIS J. LIMAN, United States District Judge:

      Petitioner O.F.C. has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241.[1]

Dkt. No. 1 (the "Petition" or "Pet."). Roughly three years ago, Petitioner filed a strikingly

similar petition, which Judge Cronan of this Court granted. *See O.F.C. v. Decker*, 2022 WL

4448728, at *11 (S.D.N.Y. Sept. 12, 2022). Judge Cronan held that by detaining Petitioner

without a proper bond hearing conducted under the appropriate constitutional standards—in that

instance, for approximately fifteen months—the Government had violated Petitioner's

procedural due process rights. *Id.* Now, having spent the last eleven months detained again in

---

[1] Petitioner has also filed a motion to proceed in this action using his initials and further requesting that his wife and children also be referred to by their initials. Dkt. No. 3. Petitioner grounds this request in safety and privacy concerns associated with his pending asylum case and a "significant risk of retaliation by third parties" should he be removed from the country. *Id.* at 2, 4. In prior habeas proceedings in this District, Petitioner sought, and received, this same relief. *See O.F.C. v. Decker*, 2022 WL 4448728, at *11 (S.D.N.Y. Sept. 12, 2022). The Court agrees that anonymity is appropriate for the reasons provided in Petitioner's application, and it grants Petitioner's request under the factors outlined in the Second Circuit's decision in *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185 (2d Cir. 2008). The parties are directed to refer to Petitioner by his initials and to redact supporting documents accordingly. *See Doe v. Barr*, 479 F. Supp. 3d 20, 26 (S.D.N.Y. 2020) (Nathan, J.) (permitting habeas petitioner to proceed anonymously and citing, among other things, a risk of retaliation should the petitioner be removed from the country and another judge's prior decision to grant the same request).

the same correctional facility based on the same faulty hearing procedures, Petitioner again seeks relief from this Court. The Court once again grants the Petition.

The Court's bottom-line conclusion was reflected in its order of January 5, 2026. Dkt. No. 20. The Court ordered Petitioner released unless within seven days (i.e., by January 12, 2026) the Government provides him with a new bond hearing before an immigration judge at which the Government bears the burden of proving by clear and convincing evidence that Petitioner is either a danger to the community or a flight risk. This Opinion contains the Court's reasoning for that decision.

## BACKGROUND

### I.    Petitioner's Life in the United States

The following facts are undisputed. Petitioner was born in El Salvador in 1993. Dkt. No. 1-4 ("Pet'r Decl.") ¶ 1. He entered the United States without documentation when he was seven years old and has never left the country since. *Id.* ¶¶ 10, 35. In 2003, Petitioner applied for and received Temporary Protected Status ("TPS"). Dkt. No. 1-1 ("Brown Decl.") ¶ 4; Dkt. No 12 ("So Decl.") ¶ 4. He attended elementary, middle, and high school in New York. Pet'r Decl. ¶ 13. He is married to a U.S. citizen and has two young daughters who are also U.S. citizens. Brown Decl. ¶ 6. His entire family including his wife, daughters, mother, father, siblings, aunts, and uncles resides here. Pet'r Decl. ¶¶ 17, 22, 35; Brown Decl. ¶ 5. He has held full-time employment since 2014. Brown Decl. ¶ 4.

In 2011, when Petitioner was seventeen years old, he was arrested and charged with driving while intoxicated ("DWI") and unlicensed operation of a vehicle under N.Y. Veh. & Traf. L. §§ 509(1) and 1192(2). Brown Decl. ¶ 7; So Decl. ¶ 6. A breath test conducted at the scene showed a blood-alcohol content of 0.24%, three times the legal limit. So Decl. ¶ 6. In January 2012, he pleaded guilty to aggravated DWI under N.Y. Veh. & Traf. L. § 1192(2)(a),

and he was sentenced to three years of probation; five days of imprisonment; a fine of $1,000 plus additional fees; and revocation of his license.  Brown Decl. ¶ 7; So Decl. ¶ 6.  As part of his probation, he underwent an eight-month alcohol treatment plan, during which he never tested positive for drugs or alcohol.  Brown Decl. ¶ 8.

Approximately eight years later, in February 2019, Petitioner was again arrested and charged with DWI in addition to other vehicle and traffic violations under N.Y. Veh. & Traf. §§ 1192(3), 1128(A), and 1212.  *Id.* ¶ 9; So Decl. ¶ 7.  Paperwork documenting the arrest reveals a blood-alcohol content of 0.233%.  So Decl. ¶ 7.  Petitioner pleaded guilty to DWI and reckless driving in September 2019 and was sentenced to four months of imprisonment; five years of probation; a fine of $2,000 plus additional fees; license revocation of eighteen months; and installation of an ignition interlock device in any vehicle he owns for a period of five years.  Brown Decl. ¶ 11; So Decl. ¶ 7.  Shortly after his arrest, Petitioner voluntarily enrolled in an alcohol treatment program through the Counseling Service of Eastern District of New York ("CSEDNY"), which he successfully completed after eight months.  Brown Decl. ¶ 10.  The treatment included group therapy three times a week, individual therapy once a week, and twenty separate supervised toxicological screenings, which he passed each time.  *Id.*  He also participated in Alcoholics Anonymous ("AA").  *Id.*  He continued to voluntarily receive treatment and to attend AA meetings while incarcerated.  *Id.* ¶ 12.  Upon his release, he was placed under an ankle monitor, which monitored the toxicology of his sweat for sixty days.  *Id.* ¶ 13.  He also presented himself at the Nassau County Probation Office each week for toxicological testing.  *Id.*

## II.    Petitioner's First Immigration Detention

In January 2021, U.S. Citizenship and Immigration Services ("USCIS") denied Petitioner's request for renewed TPS due to his criminal convictions.  *Id.* ¶ 14; So Decl. ¶ 8.

Four months later, in May 2021, Immigration and Customs Enforcement ("ICE") arrested Petitioner outside his home and initiated removal proceedings against him on the grounds that he was a person not admitted or paroled into the United States under the Immigration and Nationality Act ("Act").  Brown Decl. ¶ 15; So Decl. ¶ 9.

Petitioner spent the next fifteen months detained at the Orange County Jail ("OCJ") in Orange County, New York, where his conditions of confinement resembled those of criminal custody.  Brown Decl. ¶ 15; So Decl. ¶ 9; *see also Velasco Lopez v. Decker*, 978 F.3d 842, 850–51 (2d Cir. 2020) (noting that noncitizens detained at OCJ are "incarcerated under conditions indistinguishable from those imposed on criminal defendants sent to prison following convictions for violent felonies and other serious crimes").  He was housed in a jail cell, provided jail clothing, and subjected to jail restrictions and discipline.  Brown Decl. ¶ 27.

During that time, he attempted to secure his release via several means.  First, in early June 2021, approximately two weeks after his arrest, he requested and received a bond hearing before an immigration judge ("IJ").  *Id.* ¶ 36.  At that hearing, rather than requiring the Government to justify continued detention, the IJ placed the burden on Petitioner to prove that he was neither a danger to the community nor a flight risk.  *Id.* ¶ 36.  The IJ denied bond, finding that Petitioner had failed to carry his burden.  *Id.* ¶ 38.  Second, Petitioner submitted three requests to be released directly to ICE in August, September, and December 2021, each of which was denied.  *Id.* ¶ 40.  Third, in August 2022, over a year after his detention began, Petitioner moved for a new bond hearing on the basis of changed circumstances—namely, that he had retained new counsel, undergone a psychological evaluation regarding his risk for alcohol-abuse relapse, developed an alcohol treatment plan, and suffered significant mental and physical deterioration in detention.  *Id.* ¶ 41.  The IJ denied that motion one week later after again placing

the burden on Petitioner.  *Id.*  Fourth, and most significantly, Petitioner filed a petition for a writ of habeas corpus in this Court.  *Id.* ¶ 40; So Decl. 10.  Petitioner argued principally that placing the burden on him at his bond hearings violated due process and the Administrative Procedure Act.  Brown Decl. ¶ 40.  The Government argued in response that Petitioner had failed to exhaust his administrative remedies and that, regardless, the allocation of burdens had been lawful.  *See O.F.C.*, 2022 WL 4448728, at *1.

On September 12, 2022, Judge Cronan granted the petition.  First, he excused Petitioner's failure to exhaust administrative remedies.  *Id.* at *8.  In short, Judge Cronan explained that Petitioner was not required to appeal the denial of his request for bond to the Board of Immigration Appeals ("BIA") because (1) to the extent his claim raised constitutional questions, those matters were not within the BIA's jurisdiction; (2) to the extent Petitioner could have attempted to argue before the BIA that the allocation of burdens violated administrative law, "the BIA's consistent and lengthy record of allocating the burden of proof to detained immigrants" would have made any such argument futile; and (3) requiring Petitioner to challenge the bond determination on the merits (under the improper standard) before subsequently turning to an Article III court would advance neither judicial efficiency nor respect for agency authority.  *Id.* at *4–7.  Furthermore, citing the Second Circuit's decision in *Velasco Lopez v. Decker*, 978 F.3d 842 (2d Cir. 2020)—which likewise involved an individual detained under the same statutory provision for over fifteen months—Judge Cronan held that due process entitled Petitioner to a bond hearing at which the Government would bear the burden of proving dangerousness or risk of flight by clear and convincing evidence.  *Id.* at *8–10.  Judge Cronan further noted that at any such hearing, the IJ would need to consider alternatives to detention and Petitioner's ability to

pay a bond.  *Id.* at \*10.  Judge Cronan ordered such a hearing to occur within fourteen days or, in the alternative, for Petitioner to be released.  *Id.* at \*11.

## III.    Petitioner's Present Detention

Consistent with Judge Cronan's decision, a new bond hearing was held on September 22, 2022.  Brown Decl. ¶ 43; So Decl. ¶ 12.  At that hearing, the IJ determined that the Government had failed to carry its burden, and Petitioner was granted release conditioned upon posting a bond of $15,000, re-enrolling in an alcohol treatment program, and periodically reporting as required by ICE.  Brown Decl. ¶ 43; So Decl. ¶¶ 12–13.  Over the next approximately ten months, Petitioner reunited with his family, started a construction business, re-enrolled in an alcohol treatment program, received weekly toxicological testing (which he passed), and moved to administratively close his removal proceedings (which an IJ granted).  Brown Decl. ¶¶ 44–47.

On July 11, 2023, however, Petitioner was again arrested for vehicle-related offenses.  *Id.* ¶ 48; So Decl. ¶ 14.  Nassau County Police pulled Petitioner over and determined that he was driving without a valid driver's license, without the required ignition interlock device, and with an expired vehicle registration.  So Decl. ¶ 14.  Petitioner explains that while he typically relied on family and friends to drive him to and from work, on the day of his arrest, he received a call regarding a flooding emergency at a client's home, and no one was available to drive him to the emergency.  Brown. Decl. ¶ 48.  He therefore made the decision to drive his wife's car to the client's home.  *Id.*  He was not under the influence of alcohol or driving recklessly at the time. Dkt. No. 1-2 at 3.  On November 25, 2024, he pleaded guilty to operating a vehicle without an ignition lock in violation of N.Y. Veh. & Traf. L. § 1198 and was sentenced to 59 days in jail and a $200 fine plus surcharges.  Brown Decl. ¶ 48; So Decl. ¶ 14.  He served 38 days of his sentence.  Brown Decl. ¶ 48.

While he was incarcerated, ICE filed an immigration detainer with Nassau County requesting to be notified before Petitioner was released from criminal custody. So Decl. ¶ 15. ICE asserts that this detainer was "not honored." *Id.* On February 19, 2025, while attending a routine criminal probation check-in in Nassau County, Petitioner was redetained by ICE. Brown Decl. ¶ 50; So Decl. ¶ 16. Petitioner was then transported to a temporary holding room at 26 Federal Plaza in Manhattan before being moved to OCJ, where he has remained since. So Decl. ¶ 16. Petitioner has therefore spent the last eleven months in the same conditions he experienced only a few years prior.

Petitioner's conditions of confinement are not the only thing reminiscent of his prior detention. On May 7, 2025, Petitioner appeared for a bond hearing where an IJ acting in accordance with BIA precedent again placed the burden on Petitioner of demonstrating his eligibility for release. Brown Decl. ¶ 51; So Decl. ¶ 19; Dkt. No. 1-2 at 2 (IJ holding that "[a]n alien in a custody determination under INA § 236(a) must establish to the satisfaction of the immigration judge ('IJ') that he or she does not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight"). Although the IJ credited Petitioner's testimony that he had been sober since his February 2019 arrest, it nonetheless held that Petitioner had failed to carry his burden of establishing that he did not pose a danger to the community, as he had decided to drive in disregard of his conditions of probation. Dkt. No. 1-2 at 3–4; *id.* at 3 ("The [Petitioner] did not establish to the Court's satisfaction that he does not pose a danger to the community in light of his criminal history."); *id.* at 4 ("[T]he Court finds that [Petitioner] did not establish that he would not pose a danger to the community if released."). The IJ therefore denied bond. *Id.* at 4. Petitioner appealed to the BIA, and the BIA dismissed his appeal on September 19, 2025. Dkt. No. 1-3. The BIA held that the IJ had

properly placed the burden on Petitioner and noted that, in any event, during the pendency of Petitioner's appeal, the Board had issued a precedential decision in *In re Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025), which held that all individuals (including Petitioner) who enter the United States without inspection are subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(A). Dkt. No. 1-3 at 1–2. The BIA therefore found that the IJ lacked the authority to hear Petitioner's request for bond in the first place. *Id.* at 2.

Petitioner has not been provided a second bond hearing.

During Petitioner's detention, the Department of Homeland Security ("DHS") has also moved to reopen his removal proceedings, which had been administratively closed. So Decl. ¶ 17. An IJ granted that request, and on June 24 and July 18, 2025, Petitioner appeared for merits hearings regarding his applications for relief from removal. *Id.* ¶ 20. In a written decision on September 22, 2025, the IJ denied Petitioner's applications and ordered him removed to El Salvador. *Id.* Petitioner has appealed that decision to the BIA. *Id.* The appeal is currently pending, and Petitioner's counsel contends that if the Board grants the appeal, it will likely remand the case to the immigration court for further proceedings. Brown Decl. ¶ 58. If, however, the BIA dismisses the appeal, Petitioner intends to seek review before the United States Court of Appeals for the Second Circuit, which Petitioner's counsel asserts can take months or even years. *Id.* There is accordingly no end in sight to Petitioner's detention. *See Velasco Lopez*, 978 F.3d at 852 (noting that absent release on bond, detention under Section 1226(a) "lasts through the initial removal determination proceedings (which themselves can take months or years) and all inter-agency and federal court appeals").

## PROCEDURAL HISTORY

Petitioner filed the instant petition for a writ of habeas corpus on November 25, 2025. Dkt. No. 1. The Petition is accompanied by several exhibits including declarations from

Petitioner and his counsel, Grace Carney Brown. *See* Dkt. Nos. 1-1, 1-4. The Government filed

its response on December 15, 2025, Dkt. Nos. 10–11, along with certain exhibits, Dkt. Nos. 10-1,

10-2, 10-3, and the declaration of Deportation Officer Mincheol So, Dkt. No. 12. Petitioner filed

his reply on December 22, 2025. Dkt. No. 16. On January 5, 2026, the Court heard oral

argument on the Petition and issued an oral ruling ordering Petitioner released within seven days

unless before that time the Government conducts a new bond hearing under the appropriate

constitutional standards. This written Opinion explains that decision.

## LEGAL STANDARD

Petitioner proceeds under 28 U.S.C. § 2241, which "authorizes a district court to grant a

writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or law

or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting

28 U.S.C. § 2241(c)). "Federal courts have jurisdiction to hear habeas corpus claims by

noncitizens challenging the constitutionality of their detention." *Lopez v. Sessions*, 2018 WL

2932726, at *6 (S.D.N.Y. June 12, 2018) (citing *Demore v. Kim*, 538 U.S. 510, 516–17 (2003)).

A petitioner bears the burden of establishing his allegations by a preponderance of the evidence.

*Gotti v. United States*, 622 F. Supp. 2d 87, 91 (S.D.N.Y. 2009) (citing *Whitaker v. Meachum*,

123 F.3d 714, 716 (2d Cir. 1997)).

"Although § 1226(e) provides that '[n]o court may set aside any action or decision by the

Attorney General under this section regarding the detention or release of any [noncitizen] or the

. . . denial of bond or parole,' '[t]he Supreme Court has made clear that § 1226(e) does not . . .

limit habeas jurisdiction over constitutional claims or questions of law.'" *G.F.F. v. Francis*,

2025 WL 3141735, at *3 (S.D.N.Y. Nov. 10, 2025) (quoting *Velasco Lopez*, 978 F.3d at 849–

50). Where, as here, "the petitioner 'does not challenge the IJ's weighing of the evidence

presented at his bond hearing or the IJ's discretionary decision to deny bond[,] but rather asserts

that the procedures for that bond hearing were constitutionally and statutorily infirm,' then § 1226(e) 'does not strip the Court of jurisdiction.'" *Id.* (quoting *Torres v. Decker*, 2018 WL 6649609, at *1 (S.D.N.Y. Dec. 19, 2018)).

## DISCUSSION

### I.    Petitioner's Due Process Rights Have Been Violated.

Petitioner raises three due process arguments, each implicating a different stage of his detention.  First, he asserts that he was entitled, as a matter of procedural due process, to notice and an opportunity to be heard prior to being re-arrested and having his bond revoked.  Pet. at 21–29.  Second, and in the alternative, he argues that upon being redetained, due process required that he receive a prompt hearing at which the Government bore the burden of proving by clear and convincing evidence that he presented a danger to the community or a flight risk. *Id.* at 30–34.  Barring that, he contends that he is at least now entitled to such a hearing given the length of his current detention (approximately eleven months). *Id.* at 34–36.

The Government hardly contests the second and third points.  It acknowledges "that under this Court's prior decisions, O.F.C. would be entitled to receive a new bond hearing before an immigration judge at which DHS bears the burden by clear and convincing evidence."  Dkt. No. 11 at 2; *see also id.* (asserting that the "petition should be denied to the extent that it seeks *immediate release* or a bond hearing *before this Court*" (emphasis added)).  That concession is an appropriate one and stems from two lines of cases.  To start, this Court has held that notwithstanding the BIA's contrary decision in *Yajure Hurtado*, noncitizens who have entered the country without inspection are detained under 8 U.S.C. § 1226(a), under which detention is discretionary, rather than under Section 1225(b)(2), which imposes mandatory detention. *See Tumba v. Francis*, 2025 WL 3079014, at *2–6 (S.D.N.Y. Nov. 4, 2025).  The Court has since confirmed that holding on several occasions. *See, e.g., Campos v. Deleon*, 2025 WL 3514120, at

*1 (S.D.N.Y. Dec. 8, 2025); *Qasemi v. Francis*, 2025 WL 3654098, at *12 (S.D.N.Y. Dec. 17,

2025).  And it does so again here.  *See Goorakani v. Lyons*, 2025 WL 3632896, at *8–12

(S.D.N.Y. Dec. 15, 2025) (rebutting counterarguments to the Court's reading of the INA); *Yao v.*

*Almodovar*, 2025 WL 3653433, at *8–10 (S.D.N.Y. Dec. 17, 2025) (same).

Next, the Court has also held that noncitizens discretionarily detained pursuant to Section

1226(a) have a due process right to a bond hearing at which the Government bears the burden of

justifying continued detention by clear and convincing evidence.  *See Garcia v. Decker*, 448 F.

Supp. 3d 297, 300 (S.D.N.Y. 2020).  Although the Government expresses brief and half-hearted

disagreement with this Court's decision in *Garcia*, it "declines to press the issue here."[2]  Dkt.

No. 11 at 3.  Importantly, even if this Court's decision in *Garcia* were in some way altered by the

Second Circuit's decision in *Velasco Lopez*, as the Government suggests—and several judges in

this District have rejected that proposition, *see, e.g.*, *J.C.G. v. Genalo*, 2025 WL 88831, at *9

(S.D.N.Y. Jan. 14, 2025) (quoting *Banegas v. Decker*, 2021 WL 1852000, at *3 (S.D.N.Y. May

7, 2021))—there can be no real dispute that Petitioner is still entitled to the relief granted in

*Velasco Lopez*.  The Government reads *Velasco Lopez* as requiring it to bear the burden of proof

when noncitizens have been subjected to prolonged detention under Section 1226(a), *see* Dkt.

No. 11 at 3, and Petitioner's eleven-month detention here clearly so qualifies, *see Velasco Lopez*,

---

[2] The Court interprets the Government's decision not "to press the issue here" as abandonment—especially given that statement's contrast with the Government's assertion elsewhere that, with respect to the statutory basis for Petitioner's detention, it relies upon and incorporates by reference arguments made in a different case and "reserv[es] all rights, including the right to appeal."  Dkt. No. 11 at 2 n.2.  But the Court finds that the Government has abandoned that statutory argument as well.  The Government refers to this issue only in a footnote in "a perfunctory manner, unaccompanied by any effort at developed argumentation."  *In re Demetriades*, 58 F.4th 37, 54 (2d Cir. 2023).  And the Government relies exclusively upon argumentation made in briefing in a different case (briefing to which the Government has not provided Petitioner's counsel access).  Dkt. No. 16 at 2 n.1.

978 F.3d at 855 n.13 (noting the Supreme Court's observation made in the context of noncitizens who have been ordered removed for committing serious crimes that "a presumptively constitutional period of detention does not exceed six months" (citing *Zadvydas v. Davis*, 533 U.S. 678, 701, (2001))); *J.C.G.*, 2025 WL 88831, at *10 (holding that nine-month detention under Section 1226(a) qualifies as prolonged); *G.F.F.*, 2025 WL 3141735, at *5 (same regarding eleven-month detention); *Raspoutny v. Decker*, 708 F. Supp. 3d 371, 384 (S.D.N.Y. 2023) (same regarding seven-month detention); *Banegas*, 2021 WL 1852000, at *3 (same regarding nine-month detention). Again, the Government has not argued otherwise. Nor, as Judge Cronan put it the first time around, has the Government denied that Petitioner's "removal proceedings, and thus his detention, may continue for a lengthy and indefinite period until they are finally resolved." *O.F.C.*, 2022 WL 4448728, at *9. As all agree that Petitioner has not received the process outlined in *Velasco Lopez*, he is at the very least entitled to that much.

The question, then, is whether he is entitled to more. That issue turns on whether he was owed notice and a hearing *prior* to being arrested and redetained on February 19, 2025. If he was entitled to those procedures before being redetained, his detention has been unlawful from the start. And where an individual's detention is "unlawful from its inception," the "typical remedy" is release. *See Rojas v. Almodovar*, 2025 WL 3034183, at *8 (S.D.N.Y. Oct. 30, 2025) (quoting *Munaf v. Geren*, 553 U.S. 674, 693 (2008)); *Rodriguez-Acurio v. Almodovar*, 2025 WL 3314420, at *31 (E.D.N.Y. Nov. 28, 2025) (holding that where an individual's detention is unlawful from its inception, "a bond determination by a DHS officer or an immigration judge would not remedy the core constitutional violation," as "the detention without adequate pre-deprivation procedures has already been carried out"); *Martinez v. McAleenan*, 385 F. Supp. 3d 349, 373 (S.D.N.Y. 2019) ("As Petitioner's arrest and detention were blatantly unlawful from the

start, the only commensurate and appropriate equitable remedy to even partially restore Plaintiff is to immediately release him and enjoin the Government from further similar transgressions.").

If, on the other hand, the relevant due process violation occurred after Petitioner's redetention—e.g., when his bond hearings were conducted in an untimely manner or without proper procedural protections—that violation might be cured by something other than release, such as by ordering a constitutionally appropriate bond hearing.  *See Velasco Lopez*, 978 F.3d at 855 (holding that "the district court appropriately addressed the violation by ordering a new hearing at which the Government was called upon to justify continued detention"); *id.* (noting that habeas corpus "is an 'adaptable remedy,' the 'precise application and scope' of which changes 'depending upon the circumstances,'" and that the writ "gives the reviewing court considerable latitude 'to correct errors that occurred during the [prior] proceedings'" (quoting *Boumediene v. Bush*, 553 U.S. 723, 786, 779 (2008)); *Garcia*, 448 F. Supp. 3d at 300–01 (granting habeas petition, ordering as remedy that the petitioner be provided constitutionally adequate bond hearing, and collecting cases doing the same).  The Court therefore turns to Petitioner's argument that he was entitled to notice and a pre-deprivation hearing.

## II.    Petitioner Was Not Entitled to Notice and a Hearing Before Being Redetained.

### A.    The Statute and Regulations

At the outset, Petitioner does not contend that the INA and implementing regulations themselves require notice and a hearing before arrest and redetention.  Such a contention would be difficult to square with the text of the statute and regulations.  Section 1226(b) provides that the "[Secretary] at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien."  8 U.S.C. § 1226(b).  The regulations add that "[w]hen an alien who, having been arrested and taken into custody, has been released, such release may be revoked at any time in the discretion of [certain immigration

13

officers], in which event the alien may be taken into physical custody and detained." 8 C.F.R.

§§ 236.1(c)(9), 1236.1(c)(9). Where a noncitizen has been redetained, "any outstanding bond

shall be revoked and canceled." *Id.* "Custody and bond determinations made by [DHS] pursuant

to 8 CFR part 1236 may be reviewed by an Immigration Judge pursuant to 8 CFR part 1236." 8

C.F.R. § 1003.19.

Nothing in the brief text of the statute and the accompanying regulations suggests that

procedural protections such as notice of the intention to revoke parole, service of the evidence

justifying revocation, and a hearing before a neutral arbitrator are required prior to re-arrest and

redetention. *See Bermudez Paiz v. Decker*, 2018 WL 6928794, at *17 (S.D.N.Y. Dec. 27, 2018).

As courts have explained, Section 1226 does not require "some sort of adversarial hearing-like

process . . . before DHS may exercise its discretion to detain a noncitizen." *Lopez Benitez v.*

*Francis*, 795 F. Supp. 3d 475, 494 (S.D.N.Y. 2025). Indeed, even those courts that have found

some right to a pre-deprivation hearing have held that this right stems from the Constitution

rather than from the INA itself. *See Valencia Zapata v. Kaiser*, 2025 WL 2741654, at *11 (N.D.

Cal. Sept. 26, 2025) (stating that "the statutory protections of section 1226(a) require only a

prompt post-deprivation hearing"); *cf. Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018)

("Federal regulations provide that aliens detained under § 1226(a) receive bond hearings at the

outset of detention.").

To be sure, although Section 1226(b) does not itself require a pre-deprivation hearing, it

does still require *some* process—namely, that there be an individualized determination regarding

the noncitizen's dangerousness or risk of flight. The statute indicates that bond "may" be

revoked, and "[t]he Supreme Court has interpreted similar 'may' language in other provisions of

the INA to require the Attorney General to make 'some level of individualized determination.'"

*See Lopez Benitez*, 795 F. Supp. 3d at 493 (citation omitted).  In the context of bond revocation under Section 1226(b), any individualized determination requires not only a finding of dangerousness or risk of flight, but also of changed circumstances given that an immigration official or judge has necessarily previously found that the individual does not pose a risk of danger or flight.  *See In re Sugay*, 17 I. & N. Dec. 637, 640 (BIA 1981).  Here, as further explained below, Petitioner has failed to carry his burden of establishing that the Government failed to make such an individualized determination.  And under the INA, this Court does not have the authority to second-guess the Government's individualized determination—only to ensure that it was made in the first instance.

## B.    Due Process Precedents

Petitioner accordingly argues that notice and a pre-detention hearing are required not by the INA but by the Fifth Amendment's Due Process Clause.  Under that clause, "[n]o person shall . . . be deprived of . . . liberty . . . without due process of law."  U.S. Const. amend. V.  "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the [due process clause] protects."  *Zadvydas*, 533 U.S. at 690.  Moreover, "[t]he liberty guaranteed by that clause does not extend to United States citizens alone.  Both the language of the Constitution and the caselaw under it establish that the protection extends to all persons, including persons whom the Government alleges to be non-citizens and to be removable."  *Garcia*, 448 F. Supp. at 301.  As this Court has previously explained, noncitizens who have been granted at least some form of conditional release in the United States acquire a liberty interest under the Due Process Clause and, as such, any "termination [of that liberty] calls for some orderly process."  *Rojas*, 2025 WL 3034183, at *7 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)).

As the Court has further explained, noncitizens who have been paroled into the country or released on bond, as Petitioner was, are in many ways similarly positioned to those who have been released from criminal confinement on probation or parole. *See id.* at *6–8. These individuals enjoy "many of the core values of unqualified liberty" and structure their lives around "at least an implicit promise that parole [or probation] will be revoked only if [they] fail[] to live up to the parole [or probation] conditions." *Morrissey*, 408 U.S. at 482. Given that the termination of this liberty "inflicts a 'grievous loss' on the [individual] and often on others," *id.*, the Supreme Court has clarified, first in *Morrissey*, that individuals released on criminal parole are entitled to due process protections before having their parole revoked, *id.*, and second, in *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973), that such protections extend also to individuals released on criminal probation. The Supreme Court has further extended *Morrissey* and *Gagnon* to the context of individuals placed in a "pre-parole" program to reduce prison overcrowding. *Young v. Harper*, 520 U.S. 143, 145 (1997). And the D.C. Circuit has held that even individuals who are mistakenly released from prison early might still enjoy due process rights associated with any subsequent redetention. *Hurd v. D.C. Gov't*, 864 F.3d 671, 682 (D.C. Cir. 2017).

The Government contends that there is no support for applying these cases in the civil immigration habeas context, but it offers no explanation, let alone a persuasive one, for why they shouldn't be applied here. Dkt. No. 11 at 7–8. And the Court sees none. As the Court has previously explained, *Morrissey*, *Gagnon*, and *Young* offer broad support for the proposition that individuals who reside in the United States through some permission of the Government enjoy a form of liberty that, even if "not unlimited," entitles them to due process protections. *Rojas*, 2025 WL 3034183, at *7. Although the Court's decision in *Rojas* involved a noncitizen who had been paroled into the United States rather than released on bond, *id.* at *6, the reasoning applies

here with equal force.  Both immigration parolees and those released on immigration bond are free to live their lives in this country and to "form the . . . enduring attachments of normal life." *Id.* at *7 (quoting *Morrissey*, 408 U.S. at 482).  The facts of this case underscore the nature and depth of those attachments.  While released on bond, Petitioner was able to resume his life with his U.S.-citizen wife and his young U.S.-citizen children (one of whom was born while Petitioner was released).  He also started a construction business and participated successfully in an alcohol treatment program, among other things.  The Court has little difficulty concluding that if the Government wishes to strip Petitioner of that liberty and these attachments, it must do so in a manner consistent with due process.

The problem for Petitioner, however, is that even assuming the *Morrissey* line of cases applies in this context, those cases undercut, rather than support, his argument that he was entitled to notice and a hearing *before* being re-arrested and redetained.  In *Morrissey*, the Supreme Court held that individuals released on criminal parole are entitled to due process when the Government seeks to revoke that parole, but with respect to "the nature of the process that is due," the Court explained that "due process would seem to require that some minimal inquiry be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient *after arrest* while information is fresh and sources are available." *Morrissey*, 408 U.S. at 484–85 (emphasis added).  The Court went on to add that "due process requires that *after the arrest*, the determination that reasonable ground exists for revocation of parole should be made by someone not directly involved in the case." *Id.* (emphasis added). Such a preliminary hearing is designed "to determine whether there is probable cause or reasonable ground to believe that the *arrested* parolee has committed acts that would constitute a violation of parole conditions" and that such acts justify "hold[ing] the parolee for the final

decision of the parole board on revocation." *Id.* at 487 (emphasis added). Accordingly, it is well established that individuals whose parole or probation the Government seeks to revoke may be temporarily detained for the purpose of determining whether to hold those individuals pending a final parole or probation revocation hearing.

The Court therefore disagrees with any suggestion that *Morrissey* and its progeny require process in the form of pre-arrest notice and an opportunity to be heard. Dkt. No. 1 at 23–26. Rather, the "pre-deprivation" process that *Morrissey* requires is (1) a prompt and preliminary post-arrest hearing where a neutral adjudicator determines the existence of probable cause of a parole or probation violation; and (2) a final hearing regarding whether such a violation has occurred and whether it justifies final revocation of parole or probation. *Morrissey*, 408 U.S. at 485–89. Individuals are further entitled to notice of these hearings. *Id.* at 487–89. These procedures are deemed "pre-deprivation" not because they precede all detention, but because they precede the final revocation of probation or parole.

Given the parallels between parolees and noncitizens who are convicted of crimes while released on bond, *Morrissey* is instructive regarding the kinds of process due here. Indeed, the Second Circuit has applied *Morrissey* in the context of a noncitizen released from ICE custody during the height of the COVID-19 pandemic whose release the Government subsequently sought to revoke on the grounds that the individual had violated a court-imposed condition not to commit a crime while on release. *See Villiers v. Decker*, 31 F.4th 825, 833–36 (2d Cir. 2022). In analyzing the circumstances under which the individual could be redetained, the Circuit invoked *Morrissey* as a useful guide without distinguishing that case from the immigration context. To be sure, individuals in these various contexts are not always similarly situated. They do not necessarily share the same liberty interests, and they might be entitled to different

procedural protections.[3]  But the Supreme Court has specifically held that a prompt post-arrest hearing is sufficient in the context of revoking certain forms of conditional liberty, and that determination undermines Petitioner's contention that a pre-arrest hearing was required here.

### C.    *Mathews* Balancing

Applying the balancing test in *Mathews v. Eldridge*, 424 U.S. 319 (1976), confirms the force of the analogy to *Morrissey.  See Davis v. N.Y.S. Div. of Parole*, 2008 WL 3891524, at *8 n.29 (S.D.N.Y. Aug. 20, 2008) (noting that "analysis under *Morrissey* and *Mathews* generally yield[s] the same results").  *Mathews* governs the "adequacy of process in the context of civil immigration confinement" and "requires courts to weigh: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Hyppolite v. Noem*, 2025 WL 2829511, at *13 (E.D.N.Y. Oct. 6, 2025) (internal quotation marks omitted) (first quoting *Chipantiza-Sisalema v. Francis*, 2025 WL 1927931, at *2 (S.D.N.Y. July 13, 2025); and then quoting *Mathews*, 424 U.S. at 335).  In considering these factors, the Court is guided particularly by the Second Circuit's analysis in *Velasco Lopez, see* 978 F.3d at 851–55.

---

[3] For example, in the context of parole or probation revocation, the preliminary hearing asks whether there is probable cause of a violation, *see Morrissey*, 408 U.S. at 485–86, while in the Section 1226 bond context, the relevant question is whether there is clear and convincing evidence that the individual is a danger to the community or a flight risk, *see Garcia*, 448 F. Supp. 3d at 300–01  Furthermore, although a criminal conviction might establish a violation of probation or parole—thus satisfying the Government's burden at a preliminary hearing to revoke probation or parole—it certainly does not necessarily establish dangerousness or risk of flight at an immigration bond revocation hearing.

### 1.    The Private Interest Affected by Official Action

Turning to the first factor, the Second Circuit has explained that the private interest at stake here "is the most significant liberty interest there is—the interest in being free from imprisonment." *Id.* at 851. "Case after case instructs us that in this country liberty is the norm and detention 'is the carefully limited exception.'" *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)). That liberty interest remains fundamental notwithstanding Petitioner's conviction for a state crime. In *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024), the Second Circuit noted that even though the petitioners there were held pursuant to 8 U.S.C. § 1226(c)— which mandates the detention of a limited class of noncitizens convicted of serious crimes—the liberty interests involved "weigh[ed] heavily in favor of" granting the petitions. *Id.* at 151–52. The court observed that although the petitioners' detention was "in some sense . . . 'the result of a criminal adjudication,'" they had "served [their] entire sentence[s]." *Id.* at 151. So had Petitioner when he was redetained.

The length of Petitioner's present detention and his conditions of confinement further "heighten his [liberty] interest." *J.M.P. v. Arteta*, 2025 WL 2984913, at *16 (S.D.N.Y. Oct. 23, 2025). As with the petitioner in *Velasco Lopez*, Petitioner has spent months "incarcerated in the Orange County Correctional Facility . . . alongside criminally charged defendants and those serving criminal sentences." *Velasco Lopez*, 978 F.3d at 851 (citing *Charles v. Orange County*, 925 F.3d 73, 78 n.3 (2d Cir. 2019)); *Rashid v. Trump*, 2025 WL 3210955, at *9 (D. Vt. Oct. 27, 2025) (explaining that "[an] individual's liberty interest increases over time"). This deprivation has been, "on any calculus, substantial." *Velasco Lopez*, 978 F.3d at 851. Petitioner's declaration exhaustively details his conditions of confinement, including alleged inadequate medical care, unsanitary facilities, and malnutrition. Pet'r Decl. ¶¶ 65–80. OCJ has been the subject of similar prior "complaints for its treatment of ICE detainees, including allegations of

medical neglect, lack of access to unspoiled food, and abuse, harassment, and retaliation by jail personnel." *J.M.P.*, 2025 WL 2984913, at *16.  As during his previous incarceration at OCJ, Petitioner's psychological and physical health has deteriorated.  *See* Pet'r Decl. ¶¶ 65–80; Dkt. No. 1-13 (psychological evaluation during Petitioner's first detention).

As this Court recognized in *Garcia*—and as the Supreme Court appeared to recognize in *Morrissey* and *Gagnon*—even a temporary deprivation of liberty lasting far shorter than Petitioner's current detention implicates significant private interests.  *Garcia* noted the petitioner's substantial liberty interest without relying on the length of the detention.  *See* 448 F. Supp. 3d at 304–08; *id.* at 304 (noting that "[e]ven persons who are found by judicial officers probably to have committed serious crimes are entitled to a 'prompt' hearing at which the Government bears the burden before they may be held in detention").  And numerous other judges in this District have found similarly.  *See, e.g.*, *J.C.G.*, 2025 WL 88831, at *9 (holding that noncitizens detained under Section 1226(a) have a substantial liberty interest that requires an initial bond hearing at which the Government bears the burden of proof, and rejecting the Government's argument that under *Velasco Lopez*, due process protections only kick in later in the process).  In *Velasco Lopez*, the Second Circuit noted that it did not need "to establish a bright-line rule for when due process entitles an individual detained under § 1226(a) to a new bond hearing with a shifted burden," but that statement suggests only that the *Mathews* factors might be balanced differently at different stages of detention—it does nothing to diminish the nature of the private interest, which the Circuit found substantial.  978 F.3d at 855 n.13.

These interests come into full relief when considering Petitioner's and his family's specific circumstances.  Before being redetained, Petitioner was his young daughter's primary caregiver.  Pet'r Decl. ¶ 66.  He was also his family's primary financial provider.  *Id.* ¶ 68.  In

recent years, his wife has had serious health problems requiring heart and stomach surgery. *Id.*

¶ 67. Despite working full time, she has struggled to cover their mortgage and the costs of taking

care of their children by herself. *Id.* ¶ 68; *see Black*, 103 F.4th at 151 ("Black's seven-month-

long detention led unsurprisingly to serious financial difficulties for his family. He was the sole

income provider before his detention; he helped keep up their mortgage payments; and he cared

for his wife as she experienced ongoing health issues."). Petitioner's detention has taken an

extraordinary toll on him and his family, and the Court finds that this toll was severe even at the

outset of Petitioner's detention. The first *Mathews* factor therefore strongly counsels in favor of

providing Petitioner with an opportunity to challenge his redetention either prior to his arrest or

shortly thereafter, as criminal probationers and parolees have the chance to do.

### 2.    The Risk of Erroneous Deprivation

At the second stage of the *Mathews* test, the Court must consider "the risk of an

erroneous deprivation of such [private] interest through the procedures used, and the probable

value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335. "The only

interest to be considered at this part of the *Mathews* analysis is that of the detained individuals—

not the government." *Black*, 103 F.4th at 152.

Petitioner argues that there is "a high risk of an 'erroneous deprivation' of liberty through

the current procedures and a significant value to providing notice and a hearing" because "ICE

revoked [his] bond and conditions of release and immediately arrested and detained him without

setting forth the basis for the revocation and detention, and without first providing any hearing or

any other form of procedural due process." Pet. ¶ 85. The Court agrees that a risk of erroneous

deprivation exists insofar as Petitioner was provided with a bond hearing two-and-a-half months

after his initial detention where he was required to prove a negative (i.e., that he was not a danger

to the community or a flight risk). *See Velasco Lopez*, 978 F.3d at 851 ("[B]ecause the BIA

placed on Velasco Lopez the burden of justifying his release, there was a considerable risk of error in the BIA's findings."); *see also id.* at 853 ("Velasco Lopez was neither a flight risk nor a danger to the community but was unable to prove that was the case.").

The risk of erroneous deprivation is highlighted by Petitioner's prior detention during which he twice failed to convince an IJ that he was not a danger to the community, but where an IJ promptly found that certain conditions of release *could* guarantee the safety of the community after the burdens were reallocated and certain procedural protections were refined. That prior finding of a lack of dangerousness supports the notion that if the burden is placed as it should be on the party seeking a deprivation of liberty, a similar finding might follow here. *See Hyppolite*, 2025 WL 2829511, at *14 (observing while discussing risks of erroneous deprivation that "the record certainly establishes that there is, at the very least, a substantial likelihood that Respondents would have failed to meet their burden of proving that [the petitioner] constituted either a flight risk or a danger to the community").

The Government responds that Petitioner's erroneous-deprivation arguments ignore the "obvious reason for [his] detention—his subsequent arrest and conviction while he was free on bond." Dkt. No. 11 at 11. The Government thus seems to assume that conviction of any crime while on bond, no matter its nature and no matter how distant its occurrence from the redetention determination, would satisfy the clear and convincing standard. There is ample reason to question that conclusion both generally and here. As to the facts of the crime, Petitioner was neither under the influence of alcohol nor driving dangerously at the time. Petitioner's arrest does not necessarily suggest that he presents a danger to the community in the future. And as to Petitioner's post-release conduct, after serving his sentence for that crime, Petitioner appears to have resumed a law-abiding life with his family. He restarted probation and continued receiving

weekly check-ins and toxicological testing, which he passed.  Brown Decl. ¶ 49.  ICE appears not to have redetained him for at least a few months after he was released.  The Second Circuit explained in *Black* that even noncitizens who have been convicted of the most serious crimes are "for a variety of individualized reasons" neither a danger to the community nor a flight risk.  103 F.4th at 152; *see also id.* (stating that a prior conviction for a serious crime "may well be a poor proxy for a finding of dangerousness").  Likewise in *Villiers*, the Second Circuit found that if the district court determined on remand that the noncitizen violated a condition of release by committing a crime, that fact alone "[would] not, of course, fully resolve [the] request for revocation."  31 F.4th at 837.  The lower court would still be required to determine whether revocation of release was appropriate based on all the relevant circumstances.  *Id.*  A substantial risk of erroneous deprivation therefore remains notwithstanding Petitioner's criminal conviction.

At the same time, the probable value of a holding pre-arrest hearing rather than a prompt post-arrest one strikes the Court as far less significant than reallocating the burdens.  As explained above, while Petitioner has a liberty interest in remaining free in his community, that does not mean that the "truth-finding process" would be materially advanced by holding a bond revocation hearing before arrest rather than shortly thereafter.  At the very least, Petitioner has not specifically pointed to any such advantage.  *See* Pet. ¶¶ 85–86; *see also Garcia*, 448 F. Supp. 3d at 304 ("There is no quarrel among the parties that the Government may hold a detainee for the limited period of time necessary for the Government to process paperwork and evidence (already in its possession) to show that the detainee presents a risk of flight or a danger to the community.").  Accordingly, this second factor tips in Petitioner's favor, but not necessarily to the extent that he argues.

### 3.    The Government's Interest

As for the third factor, the Government invokes its interests in preventing flight and protecting the community.  *See* Dkt No. 11 at 11.  Those interests are well established.  *See Zadvydas*, 533 U.S. at 690.  And they are legitimate particularly where, as here, the individual has been convicted of a crime while released on bond—although, as indicated above, whether the interests are heightened depends on the individual's particular circumstances, including the nature of the crime.  For this reason, as in *Morrissey*, the Government might have an interest in temporarily holding an individual who has been convicted of a crime while on bond for a short period of time so that a neutral decisionmaker can confirm whether the individual constitutes a danger to the community.  The Second Circuit hinted as much in *Velasco Lopez* when it stated that "the Government's interest may have initially outweighed short-term deprivation of Velasco Lopez's liberty interests."  978 F.3d at 855.  Although that statement was hardly definitive and appeared in dictum, that does not provide "license to cavalierly disregard it. . . .  To the contrary, Second Circuit dictum warrants substantial deference from this Court."  *See Imhof v. N.Y.C. Hous. Auth.*, 792 F. Supp. 3d 501, 511 (S.D.N.Y. 2025) (citations and internal quotation marks omitted).  The Court believes, however, that the short period during which the Government's interests might outweigh countervailing ones does not extend beyond the time needed for the Government to process the paperwork and evidence in its possession demonstrating that the individual presents a danger or flight risk.

Where the Government cannot establish a risk of danger or flight, *Velasco Lopez* instructs that its interest in detaining an individual not only evaporates—it flips: "[S]hifting the burden of proof to the Government to justify continued detention *promotes* the Government's interest—one we believe to be paramount—in minimizing the enormous impact of incarceration in cases where it serves no purpose."  978 F.3d at 854 (emphasis added); *cf. Morrissey*, 408 U.S. at 483 ("[T]he

State has no interest in revoking parole without some informal procedural guarantees."). The same logic applies in considering the administrative burdens and societal costs associated with providing additional process. When "the Government incarcerates individuals it cannot show to be a poor bail risk for prolonged periods of time, . . . it separates families and removes from the community breadwinners, caregivers, parents, siblings and employees." *Velasco Lopez*, 978 F.3d at 855. That not only serves no purpose but undermines the Government's own interest in minimizing the fiscal and administrative effects of unnecessary incarceration and imposes societal costs by removing individuals from their families, communities, and jobs. *Id.*

These observations hold in the context of bond revocation hearings too. Indeed, all that the Second Circuit said in *Black* regarding the fiscal and administrative burdens associated with bond hearings could be said of bond *revocation* hearings as well:

> Certainly, having to do something instead of nothing imposes an administrative and fiscal burden of some kind. But the Department of Justice reported an average cost of detaining noncitizens, in 2019, of $88.19 per prisoner per day. Other estimates have placed the cost as high as $134 per day. . . . So, retaining and housing detainees imposes substantial costs as well. And, as far as we can tell, ICE may readily access the records of other law enforcement agencies for information bearing on its case for detention where necessary. . . . We expect that the additional resources that the government will need to expend to justify continued detention at bond hearings will be minimal—and will likely be outweighed by costs saved by reducing unnecessary detention.

103 F.4th at 154–55. Again, there is no public interest in detaining individuals whom the Government cannot show to be a danger to the community, even where those individuals have committed crimes while on bond. A criminal conviction might have some bearing on the detention calculus, but it certainly does not by itself establish dangerousness.

Balancing these interests, the Court ends up where it started. It finds that, similar to criminal parolees and probationers, due process does not require a pre-arrest hearing for noncitizens released on bond who have been convicted of crimes while on release. Crucially,

however, some process is still owed.  First, the statute itself requires that the Government
actually exercise discretion by making an individualized determination regarding a noncitizen's
dangerousness or risk of flight based on changed circumstances.  *Lopez Benitez*, 795 F. Supp. 3d
at 494–95 ("At a minimum . . . § 1226(a) requires a valid exercise of DHS's discretion."); *see
also Sugay*, 17 I. & N. Dec. at 640.  And second, there is good reason to believe that, even after
*Velasco Lopez*, due process requires the Government to provide a prompt post-arrest hearing at
which the individual can contest his detention and at which the Government bears the burden of
proving by clear and convincing evidence the individual's dangerousness or risk of flight based
on changed circumstances.

In reaching this conclusion, the Court does not address whether the same set of
procedures applies outside the context of noncitizens who have been convicted of a crime while
released on bond.  Where noncitizens released on bond have not committed new crimes, the
analogy to *Morrissey*, *Gagnon*, and *Young* is less apt.  And the competing interests are also
different.  Certain courts, especially ones in the Ninth Circuit, have held that noncitizens who
have not been convicted of new crimes while released on bond must be provided hearings prior
to being re-arrested by ICE.  *See, e.g.*, *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal.
2019); *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1034–36 (N.D. Cal. 2025); *Valencia Zapata*, 2025
WL 2741654, at *1; *N.D.N. v. Bondi*, 2025 WL 3251102, at *6–8 (E.D. Cal. Nov. 21, 2025); *see
also Hyppolite*, 2025 WL 2829511, at *1, 16.  The Court's decision today involves a different set
of circumstances, and the Court therefore has no occasion to consider whether on the facts
presented in those cases it would reach a similar result.

Petitioner points to *Guillermo M.R. v. Kaiser*, 791 F. Supp. 3d 1021, 1027–28 (N.D. Cal.
2025), which, like this case, involved a noncitizen who allegedly committed a crime while

released on bond. Several weeks after learning of the individual's arrest, ICE informed the petitioner that he would be redetained. *Id.* at 1028. The petitioner then moved for a preliminary injunction to prevent his arrest and redetention without the Government first conducting a bond revocation hearing. *Id.* The court granted the preliminary injunction and the requested relief. *Id.* at 1038. *Guillermo M.R.* is both consistent with and distinguishable from the current case in a few notable respects. First, the court there was also persuaded by the analogy to *Morrissey* and found guidance in the procedural protections owed criminal probationers and parolees. "In the end," the court explained, "Respondents provide no principled reason for why Petitioner's liberty interest should be less than that of a U.S. citizen parolee or probationer." *Id.* at 1032. "If a parolee serving out a sentence for a violent crime, and subject to highly restrictive conditions of release, has a sufficiently strong liberty interests to be entitled to a hearing prior to re-incarceration, then a non-citizen freed from civil detention on bond likely has a similar entitlement." *Id.* at 1033. The Court agrees that criminal parolees are entitled to a hearing prior to having their parole finally and officially revoked. *See supra* § II.B. But *Morrissey* makes clear that they are not entitled to a hearing prior to being re-arrested, only a reasonably prompt preliminary post-arrest hearing. *See id.*

It makes sense that the court in *Guillermo M.R.* was not principally focused on whether the hearing had to occur prior to or shortly after arrest because the Government in that case argued that it could unilaterally revoke the petitioner's bond—regardless of whether the individual presented a danger to the community or a flight risk—and that, for at least six months, the petitioner would have no ability to contest the revocation at a hearing before an IJ. 791 F. Supp. 3d at 1035. Rejecting such a sweeping contention, the court asserted that it had "been unable to identify any other context in which government agents could permissibly take someone

who had been released by a judge, lock up that person, and have no hearing *either beforehand or promptly thereafter.*" *Id.* at 1033 (emphasis added). The court further stated that there were "serious questions, at the very least, as to whether ICE may unilaterally deprive Petitioner of his liberty *without timely review* from a neutral decisionmaker." *Id.* at 1026 (emphasis added). The court's focus, then, was more so on whether the noncitizen was entitled to process at or near the point of detention, rather than whether the hearing had to occur on any particular side of that line. And to the extent the court did suggest that due process requires a pre-arrest hearing when the crime alleged does not present exigent circumstances, it did not address the fact that *Morrissey* is not similarly so qualified. Moreover, the court's holding came in the context of an individual who had only been arrested for a crime, not convicted of one, which, like the district court cases mentioned above, implicates different interests than those here. *Id.* at 1028 (noting that the petitioner disputed that he committed any crime).

## III. Petitioner Has Failed to Carry His Burden of Demonstrating that the Government Detained Him Without Any Exercise of Discretion.

Even if Petitioner was not entitled to a pre-arrest hearing with prior notice, his initial detention might still have been unlawful from its inception if, contrary to the INA and its implementing regulations, he was detained without an individualized determination of changed circumstances. Indeed, Petitioner argues not only that his detention has been unlawful from the start because he was owed a pre-arrest hearing, but also that ICE detained him without any exercise of discretion at all. Dkt. No. 16 at 4. Petitioner contends that because his "arrest and detention [were] effectuated without *any* due process," ordering a new constitutionally adequate bond hearing "in no way cures the initial constitutional violation." *Id.* at 9.

In making this argument, Petitioner draws on a long line of recent cases in which courts have ordered noncitizens released on the grounds that ICE exercised no actual discretion in

detaining them.  For example, in *Tumba*, the petitioner "[did] not argue that she could not be detained under 8 U.S.C. § 1226 pending the adjudication of her claim for asylum—only that before the Government [did] so, it [had to] make a discretionary determination that she no longer present[ed] a risk of flight or danger to the community."  2025 WL 3079014, at *7.  And there was no evidence of such a discretionary determination.  In fact, the Government argued that the petitioner was held pursuant to Section 1225(b)(2), which requires *mandatory* detention.  *Id.* at *2.  It was therefore undisputed "that DHS exercised no discretion whatsoever" in detaining her.  *Id.* at *7.  Her detention was, as such, "illegal from the start," and only release could cure the constitutional harm.  *Id.* at *9.  Countless courts have reached the same conclusion in recent months.  *See, e.g.*, *Lopez Benitez*, 795 F. Supp. at 494 (holding that release was appropriate where "there [was] nothing to suggest that DHS exercised any discretion *at all* in detaining" the petitioner); *Yao*, 2025 WL 3653433, at *11 (same and collecting cases).

Contrary to Petitioner's suggestion, his case is not "indistinguishable from the petitioners in the cited district court cases."  Dkt. No. 16 at 4 (quoting *Rojas*, 2025 WL 3034183, at *7).  First, although the Government now claims that, following the BIA's September 2025 decision in *Yajure Hurtado*, Petitioner's detention is mandated by Section 1225(b)(2), it concedes that "[t]hroughout his removal proceedings, and even when he was re-detained by ICE in February 2025, he has been treated as detained under 8 U.S.C. § 1226(a)."  Dkt. No. 11 at 2 n.1.  Thus, this is not a situation in which the Government, at the initial point of re-arrest, was operating under the assumption that Petitioner was subject to mandatory detention under the operative statute.  Rather, it would have believed that his re-detention required an exercise of discretion including an individualized determination of changed circumstances.  *See Sugay*, 17 I. & N. Dec. at 640; *see also Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1196–97 (N.D. Cal. 2017) (noting

DHS' representation that its practice "requir[es] a showing of changed circumstances both where the prior bond determination was made by an immigration judge and where the previous release decision was made by a DHS officer"), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018).  At least as a general matter, there is a presumption of regularity that agencies "follow their own rules," *Maiorino v. N.Y.C. Dep't of Sanitation*, 2025 WL 2928902, at *8 (S.D.N.Y. Oct. 15, 2025), and while that presumption might weaken depending on the context and circumstances, it provides at least some support for concluding that an individualized determination was made here.[4]

Second and relatedly, the Government contends in this case, unlike in many others where the detention was effected more recently, that there was an "obvious reason for [Petitioner's] detention—his subsequent arrest and conviction while he was free on bond." Dkt. No. 11 at 10–11.  This explanation is at least plausible, especially given that ICE lodged an immigration detainer for Petitioner while he was incarcerated for his state conviction.  So Decl. ¶ 15.  That detainer could reasonably be understood as some evidence of an updated assessment regarding Petitioner's dangerousness following his new criminal conviction.  Moreover, Petitioner was arrested following a check-in with his criminal probation office in Nassau County rather than at a routine immigration check-in at 26 Federal Plaza, which indicates that ICE specifically sought him out.  Brown Decl. ¶¶ 49–50; So Decl. ¶ 16.  This too suggests some level of individualized determination.

---

[4] Given the BIA's decision in *Yajure Hurtado*, the presumption of regularity might very well cut in the opposite direction now—that is, it might be fair to presume that noncitizens who have entered the United States without inspection and who have been subsequently detained are being held pursuant to a blanket policy rather than any individualized exercise of discretion.

To be sure, the evidence does not conclusively establish an exercise of discretion. Petitioner points out, for instance, that the I-200 Warrant for his arrest makes no mention of his state criminal conviction. Dkt. No. 10-2 at 1. But on a petition for a writ of habeas corpus, the petitioner bears the burden of proving his allegations by a preponderance of the evidence, *Gotti*, 622 F. Supp. 2d at 91, and given the particular circumstances of this case, he has failed to do so.

## IV.    The Appropriate Remedy Is a New Bond Hearing Before an Immigration Judge.

Because Petitioner has failed to establish that his detention was unlawful from its inception, the gravamen of the constitutional wrong occurred sometime after his arrest, and the wrong might be redressed by something other than release. *See Velasco Lopez*, 978 F.3d at 855 (noting that habeas relief "gives the reviewing court considerable latitude 'to correct errors that occurred during the [prior] proceedings'" (citation omitted)). In considering the appropriate remedy, the Court is hardly operating on a blank slate. Its decision in *Garcia* and the Second Circuit's decision in *Velasco Lopez* pave the way, as both point to the same remedy in cases where the Government has failed to provide a timely and constitutionally adequate bond hearing: ordering that such a bond hearing promptly occur. In *Velasco Lopez*, where the petitioner languished in detention for approximately fifteen months, the court stated that "the district court appropriately addressed the violation by ordering a new hearing at which the Government was called upon to justify continued detention." 978 F.3d at 855. So too in *Garcia*. 448 F. Supp. 3d at 300. And the Government does not meaningfully contest applying that relief here.[5]

The Government does, however, contest Petitioner's assertion that the Court should itself conduct any new bond hearing rather than an IJ. Dkt. No. 11 at 12–14. Petitioner grounds this

---

[5] That this has for years been the typical relief granted to individuals in Petitioner's position further undercuts his argument that a pre-arrest hearing is required, for if that were the case, *Velasco Lopez*, *Garcia*, and other cases in the same vein all granted the wrong relief—relief which failed to remedy the actual constitutional wrong of not providing a pre-arrest hearing.

request in the fact that IJs have "consistently failed to provide [him] constitutionally adequate bond hearings" and so should not "be provided *another* chance to do so." Dkt. No. 16 at 6–7. Petitioner has indeed been repeatedly and grievously failed by the administrative apparatus. Even after a prior federal judge found that he spent approximately fifteen months detained without receiving an appropriate hearing, those same exact inadequate procedures were once again applied to him upon his redetention. He has spent over two of the last approximately five years detained without proper procedural protections guaranteed to him by the Constitution. The consequences of that failure cannot be understated.

But the fact that IJs have continued to apply unconstitutional BIA precedents in Petitioner's bond hearings does not mean that, if ordered to conduct a hearing under the appropriate procedures, they would be incapable of doing so. In this very case, Petitioner was previously released by an IJ operating under constitutionally appropriate court-ordered strictures. Petitioner has not provided a persuasive explanation for why the same cannot happen again here.

There is, however, an alternative reason for hesitating before returning this matter to the immigration courts. At oral argument, the Government could not guarantee that, if the IJ grants Petitioner's release, the Government would not then seek an automatic stay of the IJ's decision. It also could not guarantee that DHS would not appeal the IJ's bond decision to the BIA on the grounds that Petitioner's detention was mandatory under Section 1225(b)(2). Either action by the Government would render the Court's intended relief illusory. Numerous courts around the country have in recent weeks held that automatic stays violate procedural due process because they result in continued detention without requiring any articulated basis or individualized findings. *See J.M.P*, 2025 WL 2984913, at *14 n. 21 (collecting dozens of cases so holding). Judge Ho's excellent decision in *J.M.P* exhaustively outlines why these stays violate due

process, and the Court joins the reasoning of that decision in full. *See id.* at \*14–23. Likewise, the Court has repeatedly found contrary to the Government's contention that individuals in Petitioner's position are not detained pursuant to the mandatory detention provision of Section 1225(b)(2). *See, e.g.*, *Tumba*, 2025 WL 3079014, at \*2–6. If, after an IJ determined at a court-ordered hearing that the Government failed to carry its burden of proving Petitioner's dangerousness but the Government could nonetheless obtain Petitioner's continued detention on the mere filing of an automatic stay application or by raising an argument that Petitioner's detention was mandatory, allowing the IJ to hold that hearing would not only be a meaningless gesture—it would aggravate the harm.

Although an automatic stay or an appeal on Section 1225(b)(2) grounds would therefore pose a potential barrier to vindicating the relief provided in this Opinion and Order, that does not necessarily require the Court itself to hold Petitioner's bond hearing. The Court can, and does, remove those barriers by enjoining the Government from invoking those procedures. *Velasco Lopez*, 978 F.3d at 855 ("Habeas corpus . . . is an 'adaptable remedy,' the 'precise application and scope' of which changes 'depending upon the circumstances.'" (quoting *Boumediene*, 553 U.S. at 786)).[6] The purpose of the bond hearing is to see if the Government can establish by clear and convincing evidence based on changed circumstances that Petitioner presents a danger to the community or a risk of flight, not to see if Petitioner can be detained on some other basis. *See Rashid*, 2025 WL 3210955, at \*15 ("In conducting the bond hearing, the immigration judge must consider only whether he is a flight risk or a danger to the community.").

---

[6] At argument, the Government did not dispute that the Court had the authority to issue such injunctive relief and represented that it would honor that relief.

With these protections in place, the Court is satisfied that the hearing can proceed before the IJ.  The Court retains the jurisdiction to conduct a bail hearing itself or to release Petitioner if the Government's actions either render the Court's order illusory, *see J.M.P.*, 2025 WL 2984913, at *12, or reflect bad faith or cause the Petitioner prejudice, *see Carmel v. U. S. Parole Comm'n*, 489 F. Supp. 113, 114–15 (S.D.N.Y. 1980) (Weinfeld, J.); *Heath v. U.S. Parole Comm'n*, 788 F.2d 85, 89–90 (2d Cir. 1986).  Furthermore, should Petitioner be released and subsequently redetained without being provided the procedural protections outlined in this Opinion, the Court expects that a prompt habeas petition will follow.

## CONCLUSION

The Petition is conditionally GRANTED.  Petitioner is hereby ordered released unless by January 12, 2026 the Government holds a bond hearing before an IJ at which the Government bears the burden of establishing by clear and convincing evidence that Petitioner is either a danger to the community or a flight risk based on changed circumstances since his previous release on bond.  In making such a determination and in setting any bond amount, the IJ must consider both alternatives to detention and Petitioner's ability to pay.

To avoid the relief in this Order becoming illusory, the Government is enjoined from exercising an automatic stay should the IJ determine that release on bond is appropriate.  The Government is further enjoined from invoking 8 U.S.C. § 1225(b)(2) as a basis for Petitioner's detention before the immigration judge or as grounds for an appeal to the BIA.

The Court retains jurisdiction over this matter to ensure compliance with its Order and, should it determine that its Order has not been complied with, also retains jurisdiction to grant Petitioner the full relief he has sought (i.e., release).  The Government is ordered to provide to the Court a transcript of any hearing that takes place before an immigration judge within one week of such hearing.

The Clerk of Court is respectfully directed to close Dkt. Nos. 1 and 3.


SO ORDERED.


Dated: January 9, 2026
    New York, New York

                                          LEWIS J. LIMAN
                               United States District Judge